# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 3, 2009 at Jackson

## STATE OF TENNESSEE v. WILLIE ANDREW COLE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2386     Steve R. Dozier, Judge**

_____

**No. M2007-02896-CCA-R3-CD - Filed June 16, 2009**

_____

The defendant, Willie Andrew Cole, was convicted by a Davidson County jury of first degree premeditated murder and tampering with evidence, a Class C felony. He was subsequently sentenced by the trial court as a repeat violent offender to concurrent terms of life without the possibility of parole for the first degree murder conviction and six years for the tampering with evidence conviction, to be served consecutively to a previous life sentence for second degree murder. In a timely appeal to this court, the defendant challenges the sufficiency of the evidence in support of his first degree murder conviction and argues that the trial court erred by admitting evidence of his prior bad acts, not suppressing his statement, denying his motion to relieve trial counsel, and not addressing alleged prosecutorial misconduct. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Willie Andrew Cole.

Robert E. Cooper, Jr., Attorney General and Reporter; Frank Borger-Gilligan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On June 19, 2005, Martha Banks discovered her father, seventy-one-year-old Joseph Banks, dead of multiple stab wounds in his Nashville apartment. The sixty-five-year-old defendant lived in the next-door apartment of the high-rise retirement building, Edgefield Manor, and was

interviewed by police investigators as part of their canvass of the building. During the interview, which took place in the defendant's apartment, a police investigator noticed that the defendant's boot tread appeared to match a bloody shoe print found in the victim's apartment. The defendant consented to a search of his apartment and turned over to the investigator his recently polished boots, which tested positive for the presence of the victim's blood. A subsequent search of his apartment uncovered, among other things, three bottles of shoe polish and four bottles of bleach as well as signs of the kitchen floor's having been recently bleached. Through conversations with other residents of the building, investigators learned that the defendant had been extremely jealous and possessive of his girlfriend, had accused the victim of having an affair with her, had threatened and assaulted the victim in the past, and had stated his intention of killing the victim in the week preceding the murder. The defendant was subsequently arrested and charged with the first degree premeditated murder of the victim and with tampering with evidence.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress the evidence uncovered in the search of his apartment on the grounds that his consent to search was not voluntarily and knowingly given. At the November 17, 2006 suppression hearing, Detective Joe Batey of the Metropolitan Nashville Police Department testified that as part of his investigation into the murder, he canvassed the high-rise retirement building where the victim's body was discovered, knocking on the defendant's door, located three feet from the victim's, shortly after noon on June 19, 2005. He said that the defendant let him in and willingly answered his questions, including how long he had lived in the apartment and whether he had heard any unusual noises in the two preceding days. The defendant was dressed in jeans, t-shirt, and flip-flops, did not appear to be intoxicated, and was articulate.

During the conversation, the defendant removed his flip-flops and put on a pair of boots that appeared to Detective Batey to have the same tread pattern as a bloody shoe print he had observed in the victim's apartment. He, therefore, excused himself, returned to the victim's apartment to verify that the tread patterns appeared to match, informed his fellow detectives of his observations, and went to his vehicle to retrieve a "consent to search a premises form." Approximately twenty-five to thirty minutes after he left the defendant's apartment, he and Detective Filter knocked again on the defendant's door. The defendant invited them in, and Batey asked the defendant for permission to search his apartment. He told the defendant that he had the right to refuse, in which case he would have to obtain a search warrant, but the defendant told him that he had no problem consenting to a search.

Detective Batey testified that he read the consent to search form aloud to the defendant, and the defendant signed the form in the presence of himself and Detective Filter. After the defendant signed the form, Detective Batey asked him to show him the soles of his shoes. Instead of simply raising his foot, the defendant sat down, removed his boots, and handed them to Detective Batey who, in turn, gave them to Detective Filter to be bagged as evidence. On cross-examination, Detective Batey testified that he did not recall the defendant's having asked him how to spell his name. He acknowledged that the defendant mentioned that he had been drinking from Wednesday

through Saturday and said that he remembered the defendant's telling him something about a pint of vodka and a six-pack of beer. He said that he did not notice the defendant shaking at any time during the interview and that the defendant was able to retrieve his socks and boots and put them on without incident.

The defendant testified that he was awakened by the screams of the victim's daughter on June 19, 2005. He was later standing in the hallway when Detective Batey emerged from the victim's apartment and instructed him to go stand around the corner. He complied, and approximately an hour later Detective Batey returned and asked him to go downtown with him. The defendant stated that Detective Batey instructed him to get his shoes and followed him, uninvited, inside his apartment when he went to retrieve them. As he was putting on his boots, Detective Batey told him that he had to have his boots and that he did not need a warrant because he had followed blood tracks from the victim's apartment to the defendant's apartment.

The defendant acknowledged that he signed the consent to search form but maintained that he was drunk at the time he signed it. He said he had been drinking since Wednesday and was so intoxicated that he had to twice ask the detective how to spell his own name. In addition, his hands were shaking at the time he signed the form because he had "a case of the DT's." On cross-examination, he testified that he bought a pint of vodka at the liquor store on Saturday night, drank half of it on his way home, and finished the rest when he got back to his apartment. He acknowledged he had not been drinking the following day when the detective talked to him and that he was able to recall the events that transpired that morning.

On May 24, 2007, the trial court entered an order denying the motion to suppress, finding, among other things, that the defendant voluntarily and knowingly consented to the search of his apartment.

## Trial

The victim's daughter, Martha Banks, testified that she attempted to call the victim all day on Saturday, June 18, 2005, but he never answered. The next day, which was Father's Day, she used her access card to go to his apartment at approximately 9:00 or 10:00 a.m. and discovered the obviously dead victim slumped over on the couch with "a lot of cuts" on his body. After the police arrived, she was sitting in the hallway crying when the defendant, who lived next door to the victim, stuck his head out his apartment door. Banks said that the defendant did not "respond to [her] any kind of way."

Pamphelia Wilson testified that she formerly lived in Edgefield Manor on the same floor as the defendant and the victim. According to Wilson, the defendant and the victim were drinking friends who at times got along fairly well but at other times did not. She said that the defendant regularly accused the victim of "wanting [the defendant's] woman," Brigette Marchbanks, and on one occasion she witnessed him push the victim down onto his couch and threaten to kill him if he ever caught him with Marchbanks. Wilson also testified that sometime in the summer of 2005

Marchbanks sought refuge in her apartment, telling her that the defendant had been beating her. She said that the defendant came to her apartment later that same night and pounded on the door for approximately three hours, "trying to get [Wilson] to make [Marchbanks] come out."

Wilson further testified that the defendant once offered her $20 to go to a "crackhouse" to search for Marchbanks, but she refused. She said that on the Friday before the victim's body was discovered, she overheard the defendant offer $20 each to two other women if they would find Marchbanks for him. At other times, she heard the defendant beating on residents' doors and yelling out the windows and in the hallways as he inquired into Marchbanks' whereabouts. Wilson stated that when she learned of the victim's death, she screamed and asked the defendant why had he killed the victim. In response, the defendant laughed and said, "I didn't do nothing to him." On cross-examination, Wilson acknowledged that she had been convicted in 1994 for possession of crack cocaine.

Henry Dean, the "floor captain" for Edgefield Manor's sixth floor apartments, testified that the victim and the defendant lived down the hall from him in 2005. He said that approximately one week before the victim's death, the defendant told him that he was going to kill the victim but would not tell him why. During the same time frame, however, Dean observed the defendant beating on the victim's door and heard him yelling, "[L]et me in there, I know she's in there, let her out of there." Dean testified that the defendant mistakenly believed that Marchbanks, a woman who frequently visited the defendant's apartment, was in the victim's apartment at that time. He said that it was obvious from the defendant's words and actions that he was jealous of Marchbanks. He stated that when he went upstairs to the sixth floor after hearing the victim's daughter's screams on Sunday, June 19, the defendant looked out his door with a "cold look" on his face. According to Dean, the defendant asked no questions about what had happened.

Brigette Marchbanks, who admitted she was a former crack cocaine addict, testified that she and the defendant dated for a period of six to eight months in 2005, but had broken up by the time the victim was killed. She said that the defendant was very jealous of her and told her when they were in the process of breaking up that he was going to hire someone to find her. She identified phone messages that the defendant left for her on June 17, 2005, subsequently admitted into evidence and played for the jury, in which the defendant told her that he was sorry and asked her to call him. She said that she had already broken up with the defendant and was out of town at the time the phone messages were left. On cross-examination, she testified that she had been out of town for several months prior to the victim's murder.

Detective Joe Batey testified that he arrived at the Edgefield Manor Apartments at approximately 11:25 a.m. on Sunday, June 19, 2005, to find a patrol officer guarding the crime scene and the deceased victim sitting on a blood-soaked couch with blood on his clothing and the floor below him. No murder weapons were found in the victim's apartment, but two restaurant-type steak knives were found in the first floor trash receptacle into which each floor's trash chute emptied. He said that the victim's wallet, keys, pocketknife, and possibly one other item, were found in the victim's pockets.

Detective Batey described meeting with the defendant at his apartment, obtaining his consent to search the premises, and taking possession of his boots. He identified the CD of his interview with the defendant at the defendant's apartment, as well as the CD of his second interview with the defendant at the police department later that same day, both of which were admitted into evidence and played for the jury. He said that although the defendant was not in custody during the interview at the police department, he read him his rights and obtained his waiver of those rights prior to conducting the second interview. He stated that the defendant never asked what had happened or how the victim had died, despite indicating that he did not know. Initially, the defendant claimed that he had not gone into the victim's apartment but then said that if he had gone in there, "it was only to help him."

Detective Batey testified that the defendant was unable to produce, and the police were never able to locate, the clothing the defendant told them he had been wearing on Saturday, June 18. He stated that an access card was required to gain entry to the Edgefield Manor Apartments and the elevators inside and that the victim's card had last been used at 4:55 p.m. on Friday, June 17; the defendant's card had last been used at 8:00 p.m. on Saturday, June 18; and the victim's visitor's access card had been used at 11:00 a.m. on June 19. He said that a subsequent search of the defendant's apartment pursuant to a search warrant uncovered, among other things, two steak knives very similar to the ones found in the building's trash bin, three bottles of shoe polish, and four gallons of bleach. He testified that he submitted cheek swabs obtained from the defendant, along with the defendant's boots and the steak knives, to the Tennessee Bureau of Investigation ("TBI") for analysis.

Officer Warren Fleak of the Identification Section of the Metropolitan Nashville Police Department's Crime Scene Unit testified that he responded to the crime scene on June 19, 2005. Among other things, he found a newspaper dated Friday, June 17, 2005, on the coffee table in front of the victim's body; footwear impressions in blood on the floor beneath the victim; and two wooden-handled steak knives with five-inch blades, one of which appeared to have blood on it, in the building's trash system. On June 23, 2005, he returned to the crime scene to assist in the execution of a search warrant. At that time he sprayed luminol, a chemical that causes a luminescent reaction in the presence of certain other chemicals and proteins, on the hallway floor leading from the victim's to the defendant's apartment and on the kitchen floor of the defendant's apartment. Officer Fleak testified that he did not recall any reaction in the hallway but that every inch of the defendant's kitchen floor "luminated" due to the presence of bleach, one of the substances to which luminol has a strong reaction.

Officer Fleak further testified that he found two steak knives in the defendant's kitchen, both with five-inch blades, which were very similar to the knives he found in the building's trash system. He stated that the distance from the defendant's apartment to the trash chute was thirty feet, ten inches. On cross-examination, he acknowledged that the defendant's apartment was generally neat and tidy and that he found no blood or bloody footprints in the defendant's apartment or in the hallway leading to the defendant's apartment.

-5-

Dr. Thomas Deering, the medical examiner who performed the autopsy of the victim's body, testified that the victim sustained multiple stab and incised wounds, including defensive wounds to the fingers of his right hand and a cluster of deadly penetrating wounds, which ranged from approximately four to five inches in length, to his abdomen. He said that the wounds to the victim's abdomen caused injury to his liver, stomach, and intestinal mesenteric arcade. The characteristics of the wounds suggested to him that the injuries were caused by a single-bladed knife, similar to the knives found in the building's trash system. Dr. Deering estimated that the victim died approximately two days, give or take twelve hours, prior to the discovery of his body.

Officer Thomas Simpkins of the Identification Section of the Metropolitan Police Department's Crime Scene Unit testified that he collected swabbing samples from the defendant's boots and from three of the knives collected into evidence and performed presumptive blood tests on the samples prior to submitting them to the TBI for analysis. According to Officer Simpkins, one of the swabbing samples he collected from the bottom of the defendant's boot yielded a presumptive positive for the presence of blood.

Detective Matthew Filter of the Metropolitan Nashville Police Department testified that the defendant agreed to submit DNA samples and described the process by which he collected oral swabs from the defendant, sealed them into evidence envelopes, and deposited them in the Metro property room. On cross-examination, he testified that he took the boots next door to the victim's apartment, stepping just inside the foyer, where he handed them to Officer Simpkins with instructions to collect and process them into evidence. He said that he was present when Officer Simpkins photographed the boots on top of a stool in the foyer of the victim's apartment and acknowledged that no one cleaned the top of the stool prior to the boots being placed upon it. On redirect examination, however, he said that he saw no blood on the stool and that the area where the photograph was taken was "nowhere near any blood or the [crime] scene, itself."

TBI Agent Charles Hardy, an expert in DNA analysis, testified that he found human blood on one of the two knives found in the apartment building's trash and on the sole of the defendant's left boot, both of which matched the DNA profile of the victim.

The defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him of the offenses charged in the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his murder conviction, arguing that the State failed to prove beyond a reasonable doubt either his identity as the murderer or the element of premeditation. The defendant contends that there was no evidence he had any recent disputes with the victim and no proof that he was in the victim's apartment near the time of the murder. He further contends that the blood on his boot could have

been transferred there by the detectives taking it into the contaminated crime scene or, in the alternative, that he could have unknowingly entered the crime scene while in a state of intoxication "after the murder had been committed to investigate a struggle." The State argues that the proof was sufficient to establish the elements of the crime and the identity of the defendant as the perpetrator. We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

Viewed in the light most favorable to the State, the proof at trial showed, among other things: that the defendant had a motive for the killing in the form of his extreme jealousy of Marchbanks; that the defendant believed that the victim was interfering with his relationship with Marchbanks and had assaulted the victim in the past over the issue; that the defendant stated his intention of killing the victim approximately one week prior to the murder; that the unarmed victim received multiple stab wounds; that the victim's wallet was still in his pocket after the murder; that the victim's blood was found on the sole of the defendant's boot and on a discarded steak knife that appeared very similar to steak knives in the defendant's apartment; that the defendant had recently cleaned the floors of his apartment; and that the defendant appeared calm after the murder and expressed no curiosity as to what had happened to the victim. This was sufficient evidence from which a rational jury could find beyond a reasonable doubt not only that the defendant was the perpetrator of the crime but also that he premeditated the killing. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for first degree premeditated murder.

## II. Evidence of Prior Bad Acts

The defendant next contends that the trial court erred by allowing evidence of his prior bad acts to be introduced at trial. The State argues that the trial court properly admitted the evidence in order to show the defendant's identity, intent, and motive for the killing. We, again, agree with the State.

Tennessee Rule of Evidence 404(b), which sets out the circumstances under which proof of other acts is admissible in a criminal prosecution, states:

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Generally, this rule is one of exclusion, and evidence is not admissible that an accused has committed some other crime or bad act independent of that for which he is charged, even though it may be a crime or act of the same character as that for which the accused is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence that a defendant has committed a crime or bad act separate from the one for which he is being tried is relevant to some matter actually in issue in the case on trial and its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. See id. "Only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995). We review a trial court's ruling on evidentiary matters under Rule 404 (b) under an abuse of discretion standard, provided the trial court has substantially complied with the prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The record reflects that the trial court followed the appropriate procedure, holding a pretrial hearing outside the presence of the jury to consider the proposed testimony of Pamphelia Wilson about seven alleged instances of the defendant's conduct. Following the hearing, the trial court issued a written ruling on July 25, 2007, in which it analyzed each alleged incident in detail. With respect to the evidence it admitted, the trial court found clear and convincing evidence that the act occurred, that it was relevant to a material issue at trial such as the defendant's motive or intent to harm the victim, and that its probative value outweighed its prejudicial effect. The trial court excluded from trial as unduly prejudicial the only specific bad act evidence of which the defendant complains in his brief, which was testimony that Wilson offered about the defendant's alleged knife assault of a man who got off the elevator with Marchbanks. The trial court concluded its written order as follows:

In this case, in the aforementioned situations in which the court has permitted the introduction of the testimony, the evidence in several instances involves specific

threats toward the named victim in the indictment all occurring within a short period of time prior to the victim's death. In the other admissible situations, the testimony demonstrates the defendant was consumed with the whereabouts of Bridgett [sic] Marchbanks and obviously suspected the victim of being involved with her, and/or believed the victim was also having some type of relationship with Ms. Marchbanks. All of this supports his motive, intent and identity in this case and is not being offered to show he acted in conformity with character. The Court has evaluated each of the situations and found Ms. Wilson[] to be a credible witness. The Court enters this order but will reevaluate the specific instances should the need arise based upon all of the evidence presented at trial. (footnote omitted).

In addition, the trial court issued a limiting instruction in the midst of Wilson's trial testimony, instructing the jury that the defendant was not on trial for any unrelated allegations mentioned by Wilson and that the jury should consider her testimony, if it placed any significance on it at all, only in terms of motive, intent, or identity with respect to the allegations for which the defendant was on trial. We conclude, therefore, that the trial court acted within its discretion in admitting the evidence and that the defendant is not entitled to relief on the basis of this claim.

## II. Failure to Suppress Defendant's Statement

The defendant next contends that the trial court erred in denying his motion for judgment of acquittal/motion for new trial on the basis that the court should have suppressed his statement to police. He contends that he was deprived of a fair trial by the admission of the statement, which was taken at a time when he was "[n]ot only . . . frightened and vulnerable, but also excessively intoxicated," rendering his agreement to speak to the detectives invalid due to lack of capacity.

The record does not reflect that the defendant ever filed any motion to suppress his statement. The defendant's motion to suppress concerned only the physical evidence uncovered in the search of his apartment, and the proof at the suppression hearing was limited to that issue. The defendant did not argue, and the trial court never considered, whether the defendant's statement should be suppressed. Tennessee Rule of Criminal Procedure 12(b)(2)(C) provides that a motion to suppress evidence must be raised prior to trial. See also State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998). The failure to raise a pretrial motion to suppress constitutes a waiver of the issue, unless the court grants relief for good cause. Tenn. R. Crim. P. 12(f)(1). We, therefore, conclude that the defendant has waived the issue by his failure to raise it in a pretrial motion before the trial court.

## IV. Denial of Defendant's *Pro Se* Motion to Substitute Counsel

The defendant next contends that the trial court erred by denying his motion to have his trial counsel removed from his case. He argues that he showed good cause for the removal of counsel, in the form of his allegations that there was animosity between himself and counsel, that counsel had lied to him, and that counsel had failed to interview witnesses. The State notes that the defendant's

original attorney had already been allowed to withdraw due to similar allegations made by the defendant and argues that the trial court properly denied the defendant's motion to substitute the second appointed attorney on the basis that the defendant offered no evidence in support of his allegations. We agree with the State.

This court has previously set out a defendant's burden for showing he is entitled to the substitution of appointed counsel:

> When an accused seeks to substitute counsel, the accused has the burden of establishing to the satisfaction of the trial judge that (a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them. Whether an accused is entitled to a substitution of counsel is a question which addresses itself to the sound discretion of the trial court.

State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991) (citations omitted).

The court considered the defendant's *pro se* "Motion to Dismiss and Reappoint Counsel" at a pretrial hearing, where the defendant complained that trial counsel had not interviewed certain witnesses. Trial counsel, however, stated that he and his investigator had interviewed everyone he believed necessary for trial. When asked for the names of the witnesses counsel had not interviewed, the defendant provided the trial court with a list of "five first names and one person with two initials." Counsel then informed the court that those were individuals for whom the defendant was unable to provide any last names, addresses or phone numbers. He said, moreover, that he had not known that the defendant wanted those individuals called except as "character type witnesses" in the event of a sentencing hearing.

At the conclusion of the hearing, the trial court denied the motion, finding that the defendant had not shown any irreconcilable conflict between himself and counsel such that he would not receive effective assistance of counsel at trial, or that there had been a breakdown in communication that would rise to the level of necessitating another substitution of counsel, which would delay the trial for at least another six months. The record supports this ruling. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to substitute counsel.

### VI. Alleged Prosecutorial Misconduct

As his final issue, the defendant complains of the trial court's failure to address alleged prosecutorial misconduct. Specifically, he contends that the trial court "erred by allowing Ms. Marchbanks['] clearly perjured testimony into trial proceedings, and by not addressing the State's actions of prosecutorial conduct [sic] when it solicited the contradictory testimony of the witnesses in this case." The defendant asserts that the State knew that Marchbanks and Dean were going to

offer contradictory testimony about the time frame in which the defendant's arguments with Marchbanks, and with the victim over Marchbanks, occurred. The State argues, *inter alia*, that the defendant has waived the issue by his failure to raise a contemporaneous objection at trial. We agree with the State.

The record reflects that the defendant did not object to the introduction of the allegedly perjured testimony at trial. Thus, he has waived appellate review of the issue. See Tenn. R. App. P. 36(a), Advisory Commission Cmts. ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."); see also State v. Pritchett, 621 S.W.2d 127, 135 (Tenn. 1981) (citing State v. Sutton, 562 S.W.2d 820 (Tenn. 1978) (explaining that "[w]ithout contemporaneous objection [to improper questions], the error, if any, is waived"). Moreover, a close reading of the portion of the transcript cited by the defendant does not support his contention that Marchbanks and Dean offered contradictory testimony. Dean testified that the defendant beat on the victim's door during the week before the victim's murder under the mistaken belief that Marchbanks was inside the victim's apartment at the time. Such testimony is not necessarily inconsistent with Marchbanks' testimony that she had been out of town for several months prior to the murder. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE